UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>   vs.<br><br>JOSE LUIS LOPEZ QUINTANILLA,<br>a/k/a Jose Luis Lopez,<br>a/k/a Jose Lopez,<br><br>         Defendant. | Case No:  CR 09-01188 SBA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT**<br><br>Docket 24 |

Defendant Jose Luis Lopez Quintanilla ("Defendant") is charged in a one-count Indictment with a violation of 18 U.S.C. § 1326(a) and (b)—Deported Alien Found in the United States.  The parties are presently before the Court on Defendant's Motion to Dismiss Indictment.  Dkt. 24.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.

I.   **BACKGROUND**

   **A.   OVERVIEW**

Defendant is a 28 year-old (DOB 12/10/1981) citizen of El Salvador.  Lopez Decl. ¶ 2, Dkt. 24-1.  He originally entered the United States without authorization in June 1990, when he was eight years old.  Id.  On or about April 18, 1994, Defendant's father, a lawful permanent resident, filed a visa petition for his wife and their children, pursuant to

§ 203(a)(2) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1153(a)(2). Waltermire Decl. at 4-5, Dkt 24-1.  In December 1998, Defendant, along with his mother and brother, applied for an adjustment of status.  Id. at 4.[1]  Defendant's mother and brother were approved for permanent resident status, but Defendant was not.  Id.  By notice, dated April 1, 2001, the United States Immigration and Customs Enforcement ("ICE"), which is part of the Department of Homeland Security ("DHS"), informed Defendant that because he did not submit the requested documentation, his "application is considered abandoned and is hereby denied."  Gov. Opp'n Ex. A at 2, Dkt. 26.  Although Defendant disputes that finding, there is no indication in the record that he challenged the denial of his application or reapplied to adjust his status.

On January 18, 2002, Defendant's son, Caleb, was born.  Def.'s Reply Ex. 2, Dkt. 27-1.  Defendant was Caleb's primary caregiver, except when Defendant was working, at which time his aunt watched him.  Leavitt Reply Decl. ¶ 4.  According to Defendant, Caleb required "a lot" of medical care, due to "bronchial problems."  Id. ¶ 5.  Caleb "frequently got sick" and "had to be rushed to the emergency room several times[.]"  Id.  Between March 26, 2002 and January 13, 2003, Caleb was seen by the Hayward Pediatric Group on eight occasions, ostensibly due to respiratory issues.  Lopez Decl. ¶ 10; Def.'s Reply Ex. C (letter from Hayward Pediatric Group).  During this time period, Defendant was employed and supported Caleb, his fiancée and her four children, and helped support his uncle, who had suffered a back injury resulting from a car accident.  Lopez Decl. ¶ 10.

In October 2002, Defendant was convicted in Alameda County Superior Court of willful infliction of corporal injury on a spouse, in violation of California Penal Code

---

[1] According to Defendant's expert, Mary Waltermire, an attorney specializing in immigration law, federal regulations provide that unmarried children who are under the age of twenty-one as of the date of filing are automatically included in the visa petition, and are assigned the same "priority date," which is based on the date the application was originally submitted.  22 C.F.R. § 42.53(a).  As of the priority date (April 18, 1994), Defendant was twelve years-old and unmarried, and therefore, he was automatically included in the visa petition submitted on behalf of his mother by Defendant's father.  Id. § 42.53(c); Waltermire Decl. at 4.  Defendant, his mother and his brother applied for adjustment of status in December 2008, when visas became available based on their priority date.  Waltermire Decl. at 4-5.

§ 273.5(a), and was sentenced to three years imprisonment.  Id. ¶ 4.  According to Defendant, he had been paying rent on behalf of the victim (apparently his fiancée) and otherwise supporting her and her children.  Def.'s Mot. Ex. A.  They had an argument, at which point Defendant left and told her that he was no longer willing to pay her rent.  Id.  Out of spite, the fiancée allegedly filed a false report that he had raped and assaulted her.  Id.  Notably, the fiancée had previously made the same type of accusation against her ex-husband.  Id.  Following the preliminary hearing, the lack of evidentiary support for the charges became apparent, prompting the prosecutor to offer to drop the rape and oral copulation charges if Defendant pled to the domestic violence charge.  Id.  Defendant claims that he accepted the plea offer because he was otherwise facing a thirty-two year sentence.  Id.

### B.   PROCEEDINGS BEFORE THE IMMIGRATION JUDGE

At some point in 2004, ICE commenced removal proceedings against Defendant. Packel Decl. Ex. B.  On March 1, 2004, Defendant appeared before an Immigration Judge ("IJ") in San Diego, California.  Lopez Decl. ¶ 5.  The IJ advised Defendant that there were two charges pending against him, one involving a crime of moral turpitude and the other that he entered the United States without inspection.  Packel Decl. ¶ 4, Dkt. 24-1.  During the course of the hearing, Defendant informed the IJ that until the time of his arrest, he was employed and providing support for his son, his fiancée and her four children, and that he had been doing so for a number of years.  Id. ¶¶ 4, 7.

When Defendant asked the IJ whether he had any chance of avoiding deportation, she responded, "You don't."  Id. ¶ 6.  The IJ then stated that:  "There's only one application you can make.  In order to make that application, you would have to prove that it's more likely than not that if you were to return to El Salvador that the Salvadoran government would torture you for some reason."  Id. ¶ 8.  The IJ stated that if Defendant were able to prove this, he would be eligible for a deferral of deportation, "[b]ut only until the government changes."  Id.  Defendant then attempted to explain the circumstances surrounding his prior conviction.  Id. ¶ 9. In response, the IJ explained that while she could

consider such information in some circumstances, she was foreclosed from doing so in *his* case because he was convicted of a crime of violence and sentenced to a term of imprisonment for three years.  Id.  The IJ reiterated that "there's nothing that [she] could do for [him]."  Id.

After stating that she had reviewed with Defendant "all the reasons" why he did not have relief available to him, the IJ asked Defendant whether he had "any reason to think that the Salvadoran government would harm [him] in any way if [he] had to go back there?"  Id. ¶¶ 13-14.  Defendant responded:  "To be honest, I don't know.  But I mean … From here I got east Los Angeles on my back, you know?  I mean, this is my country so I don't know."  Id.  Understandably shaken, Defendant also stated that all his ties were to the United States and that he had no family in El Salvador.  Def.'s Mot. Ex. A.  The IJ noted that El Salvador had gang problems, to which Defendant responded that he was not a gang member.  Id.  In turn, the IJ told Defendant, "So long as you go there and don't cause any problems for anybody there probably won't be any problems for you."  Id.  The IJ then entered her order of deportation, which Defendant accepted.  Id.  Defendant was deported later in March 2004.  Lopez Decl. ¶ 2.

### C.   CURRENT PROCEEDINGS

In or about March 2009, Defendant allegedly reentered the United States without authorization.  Gov. Opp'n at 2, Dkt. 26.  The Government supposedly learned of his return through a tip from a family member of his girlfriend.  Id.  On December 17, 2009, the Government filed an Indictment against Defendant, charging him with illegal reentry following deportation under 18 U.S.C. § 1326.

Defendant has now filed a motion to dismiss the Indictment on the grounds that the prior 2004 deportation order was unlawful, and therefore, cannot serve as the predicate to a charge of unlawful reentry.  In particular, Defendant contends that the IJ failed to properly advise him of his ability to avoid deportation by seeking a waiver of inadmissibility under § 212 of the INA ("§ 212(h) waiver"), 8 U.S.C. § 1182(h).  In addition, the IJ allegedly misinformed Defendant of the requirements to seek protection under the Convention

- 4 -

Against Torture ("CAT"), 8 C.F.R. § 1208.16.  As will be discussed below, the record confirms that the IJ failed to properly advise him regarding possible options to challenge his deportation.  However, the Court finds that Defendant was not prejudiced by the IJ's errors, and therefore, his collateral attack on the prior deportation order fails.[2]

## II.   LEGAL STANDARD

To establish a violation of 8 U.S.C. § 1326, the Government must prove that (1) the defendant is an alien, (2) who has been denied admission, excluded, deported, or removed, and (3) who thereafter attempted to reenter or was found in the United States without permission of the Attorney General or his or her successor.  A valid removal order is prerequisite to establish a § 1326 violation.  See United States v. Mendoza-Lopez, 481 U.S. 828, 837-39 (1987).  Under § 1326(d), a defendant charged with illegal reentry may seek dismissal of such charge by collaterally attacking the prior removal order.  Id.

In order to sustain a challenge to a prior deportation order in a § 1326(d) action, the defendant must, within constitutional limitations, demonstrate (1) that he exhausted all administrative remedies available to him to appeal his removal order, (2) that the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair.  8 U.S.C § 1326(d); United States v. v. Ramos, --- F.3d ---, 2010 WL 3720208, at *6 (9th Cir. Sept. 24, 2010).  "An underlying removal order is fundamentally unfair if an alien's due process rights were violated by defects in the underlying deportation proceeding, and if he suffered prejudice as a result of the defects."  Id.  (internal quotation marks omitted).  Here, the focus of the parties' dispute is on whether the removal proceedings before the IJ were fundamentally unfair.

---

[2] After Defendant filed his reply, the Government filed a request to submit a surreply to address new facts presented in Defendant's reply, as well as to discuss a Ninth Circuit decision that was rendered following the close of briefing.  Dkt. 28.  In response, Defendant filed a motion to file a surreply to the Government's surreply.  Dkt. 31. The Court grants both parties' requests and considers the arguments and evidence presented in the additional briefs.  In addition, the Court has reviewed in its entirety the audio tape recording of the removal hearing.  Def.'s Mot. Ex. A.

### III. DISCUSSION

#### A. SECTION 212(H) WAIVER

##### 1. Error

The threshold question presented is whether the IJ violated Defendant's due process rights by providing him with erroneous information regarding his eligibility for relief from deportation. If an alien is potentially eligible for such relief, "the IJ must advise the alien of this possibility and give him the opportunity to develop the issue." United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000) (citation omitted); 8 CFR § 1240.11 ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing"). "The requirement that the IJ inform an alien of his or her ability to apply for relief from removal is 'mandatory,' and 'failure to so inform the alien of his or her eligibility for relief from removal is a denial of due process that invalidates the underlying deportation proceeding.'" United States v. Ubaldo-Figueroa, 364 F.3d 1042, 1050 (9th Cir. 2004) (citations and brackets omitted).

In the instant case, Defendant contends that the IJ failed to advise him that he could seek relief from deportation by submitting a § 212(h) waiver based on family hardship. Def.'s Mot. at 9-10. Generally, an alien who is deemed "inadmissible" under § 212(a) of the INA may seek a waiver of inadmissibility pursuant to § 212(h). 8 U.S.C. § 1182(h). A § 212(h) waiver is required for the alien to adjust status (to become a lawful permanent resident) by waiving his ground of inadmissibility. Mendoza v. Holder, -- F.3d --, 2010 WL 4227879, at *1 n.3 (9th Cir. Oct. 27, 2010). A § 212(h) waiver may be granted by the Attorney General if the alien can show that (1) he "is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence" and (2) that his or her "denial of admission would result in extreme hardship to the United

States citizen or lawfully resident spouse, parent, son, or daughter of such alien." See 8 U.S.C. § 1182(h)(1)(B) (emphasis added).[3]

At his 2004 removal hearing, Defendant specifically informed the IJ that his parents and his son, Caleb, were legal residents of the United States. Packel Decl. ¶ 5; Leavitt Reply Decl. ¶ 3. He further stated that he had been working at his job for almost five years, and that he has been caring and providing support for Caleb, as well as his fiancée and her four children and his uncle. Packel Decl. ¶ 5. Despite having received this information, the IJ told Defendant that he had no avenues for relief, other than CAT. Specifically, when Defendant inquired whether he had any recourse for challenging his deportation, the IJ responded with, "You don't." Packel Decl. ¶ 6. The IJ also repeatedly stated that there were "no applications" Defendant could make to avoid deportation because of his conviction on an aggravated felony, and therefore, she had "no choice" but to order his deportation. Id. ¶ 6, 10. When Defendant queried the IJ that "there's no way I can actually get, you know, not deported [sic], basically?" the IJ responded, "That's correct." Id. ¶ 10. Notably, the Government concedes that the IJ "incorrectly" advised Defendant regarding his eligibility to seek relief from removal. See Gov.'s Opp'n at 3. Accordingly, based on the record presented, coupled with the Government's acknowledgment of error, the Court is persuaded that Defendant's due process rights were violated as a result of the erroneous information provided by the IJ to Defendant at his removal hearing.

### 2. Prejudice

"To prevail on a motion to dismiss an indictment on the basis of an alleged due process defect in an underlying deportation proceeding, a defendant must not only establish

---

[3] The parties dispute the showing necessary to obtain a waiver under INA § 212(h). The Government contends that Defendant has failed to establish that his "admission would not be contrary to the national welfare, safety, or security of the United States[.]" United States v. Arce-Hernandez, 163 F.3d 559 (9th Cir. 1999). However, INA § 212(h) contains three separate waiver provisions, only one of which contains the "national welfare" requirement. See 8 U.S.C. § 1182(h)(1)(A)(ii). The waiver provision relied upon by Defendant is set forth in 8 U.S.C. § 1182(h)(1)(B), which only requires the alien to demonstrate "to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien[.]"

that the defects in the deportation proceeding violated his due process rights, but also show that he suffered prejudice as a result of those defects." Ramos, 2010 WL 3720208 at *9. "Although [a defendant] need not conclusively demonstrate that he would have received relief to show prejudice, he must show that there were 'plausible grounds for relief.'" United States v. Moriel-Luna, 585 F.3d 1191, 1196 (9th Cir. 2009) (quoting in part United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003)).  The burden is on the defendant to make a prima facie showing of prejudice. Gonzalez-Valerio, 342 F.3d at 1054.  If the defendant makes such a showing, "[t]he burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome." Id.

                *a)*    *Impact of Ramos*

The Government contends that Defendant is precluded from showing prejudice resulting from the IJ's failure to properly inform him about seeking a § 212(h) waiver as a result of the Ninth Circuit's recent decision in Ramos.  In that case, the defendant, a citizen and native of Mexico, entered the United States without inspection (authorization) in or around 1990.  In 2006, the DHS issued an arrest warrant and notice to appear to the defendant, charging him with removability for: (1) commission of a crime involving moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I); (2) commission of a controlled substance violation, id., § 1182(a)(2)(A)(i)(II); and (3) presence in the United States without admission or parole, id. § 1182(a)(6)(A)(i).  Ramos, 2010 WL 3720208 at *2.  The defendant later signed a stipulation agreeing to his removal under 8 U.S.C. § 1182(a)(6)(A)(i) and a waiver of his right to a hearing before an IJ. Id. at *3.  Following his deportation, defendant was arrested while crossing the Mexico-United States border and charged with illegal reentry following deportation in violation of 18 U.S.C. § 1326.  The defendant filed a motion to dismiss claiming that he was denied due process in connection with the stipulated removal proceedings.  The district court disagreed and denied the motion to dismiss. Id. at *5.

On appeal, the Ninth Circuit upheld the district court's ruling. While concluding that the IJ and DHS's handling of the stipulated removal had, in fact, violated defendant's right to due process, the Ramos court nonetheless concluded that the denial of the motion to dismiss was proper because he was legally barred from seeking a § 212(h) waiver. Id. at *9-10. The court explained:

> To establish prejudice, Ramos contends only that he would have qualified for relief under INA § 212(h), 8 U.S.C. § 1182(h), and presents no other plausible grounds for relief. However, Ramos is statutorily ineligible for this relief. <u>INA § 212(h) does not provide relief for aliens removed for illegal presence in the United States without admission or parole in violation of 8 U.S.C. § 1182(a)(6)(A)(i), the ground upon which Ramos was ultimately removed.</u> Whether Ramos would be eligible for a waiver of removal on the ground of his controlled substance violation is therefore immaterial. Accordingly, we conclude that Ramos was not prejudiced as a result of the due process or regulatory violations in the underlying stipulated removal proceedings, and affirm the district court's denial of the motion to dismiss the indictment on that basis.

Id. at *10 (emphasis added).

As in Ramos, Defendant herein was removed pursuant to INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). See Packel Decl. Ex. B, Dkt. 24-1 at 35. The Government posits that since Defendant was removed under 8 U.S.C. § 1182(a)(6)(A)(i), he could not legally avail himself of a waiver under INA § 212(h). However, the Government overlooks that Defendant's particular circumstances distinguish his situation from the defendant in Ramos. As a result of the initial visa application submitted by Defendant's father in 1994, Defendant remained eligible to adjust his status through his father, which could have resolved the charge for entering without having been admitted. See Waltermire Decl. at 6.[4] Upon the adjustment of status, the bar to seeking relief under a § 212(h) waiver, i.e., Defendant's illegal presence in the United States without admission or parole in violation

---

[4] According to Defendant's expert, it was possible at the time of the removal hearing in 2004 for Defendant's father to file a new visa petition for Defendant, which would "recapture" the priority date of April 18, 1994. Waltermire Decl. at 5. The Government does not dispute that this option remained open to Defendant.

of 8 U.S.C. § 1182(a)(6)(A)(i), would no longer exist, thereby permitting him to apply for a § 212(h) waiver. Given this distinction, the Court is not persuaded by the Government's contention that <u>Ramos</u> erects an absolute bar to Defendant's ability to seek relief under § 212(h).

### b) "Extreme Hardship" Requirement

The above notwithstanding, Defendant has failed to demonstrate that he had "plausible" grounds for seeking a § 212(h) waiver. <u>See</u> <u>United States v. Arce-Hernandez</u>, 163 F.3d 559, 563-64 (9th Cir. 1998) (noting defendant must show prejudice by "tender[ing] a plausible case that he is eligible for a waiver"). "Under § 212(h), the Attorney General may waive removal if deportation would cause 'extreme hardship' to relatives of the alien who are U.S. citizens or permanent legal residents." <u>United States v. Becerril-Lopez</u>, 541 F.3d 881, 886 (9th Cir. 2008) (citing 8 U.S.C. § 1182(h)(1)(B)). "Extreme hardship requires great actual or prospective injury or extreme impact on the citizen family member, <u>beyond the common results of deportation</u>." <u>Moriel-Luna</u>, 585 F.3d at 1199 n.5 (citation and internal quotations omitted, emphasis added). The Ninth Circuit has held that it "will find prejudice only after a <u>clear, detailed demonstration</u> that the defendant provided 'non-economic familial support' or 'something more' than financial support." <u>Becerril-Lopez</u>, 541 F.3d at 886 (emphasis added).

In his motion, Defendant contends that he made a sufficient showing that his family would suffer extreme hardship as a result of his deportation. In the declaration accompanying his motion, Defendant states that his then two year-old son, Caleb, who is an American citizen, suffers from a serious, hereditary bronchial condition. Lopez Decl. ¶ 10; Leavitt Reply Decl. ¶ 3. In addition to caring and supporting Caleb, Defendant claims that he also was supporting his fiancée and her four children, who also are citizens. <u>Id.</u> He also helped support his uncle, who had suffered an injury and was unable to work. <u>Id.</u> These assertions are unavailing. The requisite "extreme hardship" under INA § 212(h) must be suffered by the alien's spouse, children and/or parents who are citizens or lawful residents. The only person meeting this requirement is Caleb, Defendant's son. As to Caleb, the

1  Court concurs with the Government that Defendant's showing is too vague and conclusory
2  to constitute a "clear, detailed demonstration" that Defendant provided non-economic
3  familial support or something more than financial support. See Becerril-Lopez, 541 F.3d at
4  886.
5      In his reply brief, Defendant attempts to respond to the Government's criticisms by
6  providing "more detail about the extreme hardship." Def.'s Reply at 8.  In particular,
7  Defendant adds that he was the primary caregiver for Caleb and was with him at all times,
8  except when he was at work when his aunt cared for his son. Leavitt Reply Decl. ¶ 4.[5]
9  Caleb's respiratory condition caused him to become sick often and resulted in a number of
10 visits to the hospital emergency room. Id. ¶ 5. Defendant brought Caleb to the doctor,
11 ostensibly for his medical condition, on a number of occasions in 2002. Id.; Def.'s Reply
12 Ex. C (letter from Hayward Pediatric Clinic). Following Defendant's incarceration, Caleb
13 visited Defendant weekly (and then monthly after his parents began watching Caleb). Id.
14 Following Defendant's deportation, Defendant and Caleb continued to maintain contact.
15 Id. ¶ 7.
16     The additional factual details provided by Defendant with his reply still fail to
17 demonstrate that Defendant had a plausible ground for obtaining a § 212(h) waiver based
18 on extreme hardship. By all accounts, it is apparent that Defendant cares deeply for his
19 biological son, as well as the children of his fiancée. It also is evident from having
20 reviewed the recording of the immigration hearing as well as the documents submitted by
21 the parties that Defendant's deportation was difficult both on Defendant, as well as his
22 family. Nonetheless, Defendant has not shown that the hardship imposed upon Caleb was
23 an "extreme" one, as that term has been interpreted by Ninth Circuit. For example, in
24 Arce-Hernandez, the Ninth Circuit held that defendant's claim that his sick wife would
25 suffer if he were deported was insufficient to state a plausible claim of waiver. 163 F.3d at
26 564. While recognizing that the defendant's deportation would pose a hardship, the court

---

[5] The information was provided by Defendant to his counsel by telephone, since he is in custody at Santa Rita County Jail. Leavitt Reply Decl. ¶ 2.

explained that such hardships were not "extreme and beyond the common results of the deportation of a convict." Id.  To the contrary, such hardship "describes the typical case of hardship that follows deportation of an alien whose citizen wife and children were all acquired after his illegal entry into the United States." Id.  Likewise, while Defendant has shown that Caleb suffered from a medical condition that perhaps required specific attention, Defendant has made no showing that his absence was likely to cause Caleb to suffer extreme hardship.

Defendant relies heavily on the Ninth Circuit's statement in United States v. Arrieta, 224 F.3d 1076 (9th Cir. 2000) that "[t]he existence of family ties in the United States is the most important factor in determining hardship." Id. at 1082.  In Arrieta, however, the defendant made a specific and documented showing that he provided his family with significant financial support and the extreme non-financial hardship his family would suffer in his absence.  The defendant proffered an affidavit from his mother to substantiate the critical role he played in raising his younger siblings.  In addition, the defendant's mother stated that she was in very poor health and how defendant provided "essential assistance … in helping to raise [her two citizen] children, especially when she was medically unable to do so." Id.  The court also highlighted the evidence that the defendant produced regarding "the effect that separation from him would have on his immediate family members, as to whom he provided essential emotional and other non-economic familial support." Id.  It was in this particular context that the court recognized "that 'preservation of family unity' may be a central factor in an extreme hardship determination." Id.

Unlike the defendant in Arrieta, Defendant has failed to present specific evidence to show how his deportation would result in an extreme hardship in terms of disrupting family unity.  Indeed, no declarations from any of Defendant's family have been proffered in support of his claim of extreme hardship.  And although he is the father of Caleb, a citizen, the Court notes that Defendant was incarcerated for most of Caleb's life.  When Defendant was convicted on October 29, 2002, Caleb was approximately nine months old.  Defendant remained in custody until his deportation in 2004.  As a result, prior to his incarceration,

Defendant had raised Caleb for less than a year. Moreover, the fact that Caleb has been cared for since Defendant's incarceration and subsequent removal, apparently without any stated difficulty or detriment to Caleb, undermines Defendant's claim of extreme hardship. The Court therefore finds that Defendant has failed to demonstrate that he had a plausible basis for relief under § 212(h).

### B.  CONVENTION AGAINST TORTURE

#### 1.  Error

In addition to claiming that the IJ misadvised him regarding his right to seek an INA § 212(h) waiver, Defendant also contends that the IJ misadvised him about obtaining relief under CAT. Def.'s Mot. at 10. "An applicant for CAT relief has the burden 'to establish that it is more likely than not that he ... would be tortured if removed.'" Villegas v. Mukasey, 523 F.3d 984, 988 (9th Cir. 2008) (quoting Al- Saher v. INS, 268 F.3d 1143, 1147 (9th Cir. 2001)) (alteration in original)). Torture is "an extreme form of cruel and inhuman treatment" "by which severe pain or suffering is intentionally inflicted on" another by or with the acquiescence of government officials. 8 C.F.R. § 208.18(a). Government acquiescence does not require actual knowledge or willful acceptance of the torture; rather, awareness of such torture by third parties gained either through actual knowledge or willful blindness is sufficient. Zheng v. Ashcroft, 332 F.3d 1186, 1194-95 (9th Cir. 2003) (considering CAT claim based on torture inflicted by smugglers).

In the instant case, the IJ informed Defendant that: "There's only one application you can make. In order to make that application, you would have to prove that it's more likely than not that if you were to return to El Salvador that the Salvadoran government would torture you for some reason." Packel Decl. ¶ 8 (emphasis added). Defendant argues that the IJ overstated the requirements for seeking protection under CAT by asking Defendant only whether "the El Salvadoran government" would inflict torture. Def.'s Mot. at 11. Defendant is correct. CAT protection applies to torture by the government directly, as well as by third parties, provided that the government acquiesced in the torture. See Zheng, 332 F.3d at 1194-95. Notably, the Government inexplicably ignores this patent and

critical distinction in its opposition. Gov.'s Opp'n at 8. Thus, based on the record presented, the Court finds that the IJ misstated the law to Defendant, and in doing so, violated his right to due process.

### 2. Prejudice

Though the IJ provided erroneous information to the Defendant regarding CAT, the Court is not persuaded that Defendant has met his burden of demonstrating prejudice. Defendant claims that in 2004 the violence and torture by the El Salvadoran government was common knowledge, Waltermire Decl. ¶ 9, that he "feared being tortured, either by the government or by others with the government agreeing or turning a blind eye, if [he] was returned to El Salvador," Lopez Decl. ¶ 8. Defendant claims that "[f]rom talking to people, news reports and documentaries, [he understands] that anyone in El Salvador who has tattoos is harassed by police, beaten and thrown in jail." Id. Defendant further claims that he was dissuaded from seeking protection under CAT by virtue of the IJ's incorrect advice. Def.'s Mot. at 13; Lopez Decl. ¶ 8.

The record presented does not support Defendant's assertion that he would have had a plausible claim for obtaining protection under CAT had he submitted such an application to the DHS. As noted, an alien "must show that it is 'more likely than not' that he or she will be tortured, and not simply persecuted upon removal to [such] country.'" Lanza v. Ashcroft, 389 F.3d 917, 936 (9th Cir. 2004) (quoting Kamalthas v. INS, 251 F.3d 1279, 1283 (9th Cir. 2001)). In addition, the petitioner must demonstrate that he would be subject to a "particularized threat of torture," id., and that such torture would be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," 8 C.F.R. § 208.18(a)(1). Here, Defendant simply opines that, based on what he has heard from third party sources, persons with tattoos in El Salvador are harassed and beaten by the police—and that because he also has tattoos, he is at risk of suffering the same fate. Def.'s Reply at 11. Defendant's conclusory and unsupported statement fails to satisfy the "particularized threat of torture" showing necessary to obtain protection under CAT.

Equally unavailing is Defendants' reliance on an April 2006 report by the United States Agency for International Development ("USAID") to show the "dangerous conditions" in El Salvador. Def.'s Reply at 11-12.[6] According to Defendant, the report states that around the time of Defendant's deportation, the El Salvadoran government allegedly had enacted various "hard line" initiatives in response to gang violence. Id. at 12. Such initiatives purportedly allow law enforcement officers to "randomly apprehend and book gang members." Id. The report also notes that sixty percent of gang members in El Salvador prison are U.S. deportees or are facing criminal charges in the United States, which Defendant suggests supports the notion that persons deported from this country "are at risk of at least incarceration, if not worse, solely on their perceived or assumed gang affiliation." Id.

The information contained in the report is insufficient to substantiate Defendant's claim for seeking protection under CAT. While gang members in general may be targeted in El Salvador, Defendant does not assert or show that he is a gang member. To the extent that Defendant is claiming that El Salvadoran law enforcement officials might perceive him to be a gang member based on his tattoos,[7] Defendant ignores that the USAID report does not state that individuals are targeted because of their tattoos. In any event, while the report may support the notion that deportees may face potentially serious dangers in El Salvador, it does not show that Defendant would face a particularized threat of torture. See Dhital v. Mukasey, 532 F.3d 1044, 1051 (9th Cir. 2008) (State Department reports regarding atrocities by and between Nepalese government and Maoists insufficient to establish a

---

[6] Defendant did not append a copy of the report, but instead cites the URL: http://www.usaid.gov/locations/latin_america_caribbean/democracy/els_profile.pdf.

[7] Defendant states that he has tattoos, but does not describe them or indicate where they are located. Leavitt Reply Decl. ¶ 8. The Court notes that at the hearing before the IJ, Defendant stated, "I got east Los Angeles on my back[.]" However, it is unclear from the record whether Defendant was referring to any of his tattoos, and if so, what he meant by that reference. See Lopez Decl. ¶ 14. In any event, as discussed above, Defendant has made no showing that his particular tattoos are the type that allegedly would cause El Salvadoran law enforcement authorities to perceive him as a gang member and torture him as a result.

1 particularized threat of torture by Nepalese as to defendant, who was an Nepalese anti-Mao activist); Almaghzar v. Gonzales, 457 F.3d 915, 923 (9th Cir. 2006) (explaining that although State Department reports "confirm[ed] that torture takes place" in the petitioner's home country, they did not compel the conclusion that the petitioner would be subject to a particularized threat of torture if returned).  Accordingly, the Court concludes that Defendant has failed to show prejudice resulting from the misinformation provided by the IJ regarding the requirements of CAT.

## IV.   CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1.   The Government's Request for Leave to File Response to Defendant's Reply Re: Motion to Dismiss Indictment (Dkt. 28) and Defendant's Motion to File Surreply and Surreply Re: Motion to Dismiss Indictment (Dkt. 31) are GRANTED.

2.   Defendant's Motion to Dismiss Indictment (Dkt. 24) is DENIED.

3.   The hearing on the instant motion scheduled for November 30, 2010, is VACATED.

4.   The parties shall appear before Magistrate Judge Donna M. Ryu in Courtroom 4 for status on Friday, December 3, 2010, at 10:00 a.m.

IT IS SO ORDERED.

Dated:  November 29, 2010

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge